LEWIS *against* DE FOREST and others.
LEWIS and others *against* DE FOREST and others.
PHOENIX BANK *against* LEWIS and others.

A and B, partners, being in failing circumstances, executed certain mortgages of real and personal estate to C, for his security against certain liabilities incurred for them. The condition of each deed specified, that C was ac-

commodation indorser and signer for $A$ and $B$, on sundry notes, drafts, and bills of exchange of theirs, to sundry persons, banks, &c., to the amount of 50,000 dollars, which notes &c. were then maturing; a particular description of which they were not able to give, but which it belonged to them to pay and meet. At the time the mortgages were given, it was necessary, in order to secure $C$, that they should be given immediately, and before a more accurate description of the notes &c., could be made; the notes &c. not then being in the possession of either of the parties. It was held, that the mortgages were not void for uncertainty, but were valid, as against subsequent incumbrancers.

Soon after the execution of the mortgages, $C$ became insolvent, having executed an instrument in writing to $D$, who was an indorser subsequent to $C$, of certain of the notes and drafts referred to in the deeds, that he would apply the property mortgaged and the proceeds thereof to the payment of such notes and drafts, as were so indorsed by $D$; and declaring, by such agreement, that he held the mortgaged property in trust for $D$, for that purpose alone. $C$ paid and took up, from time to time, such of the notes and drafts of $A$ and $B$, as he preferred, to an amount greatly exceeding the value of the mortgaged premises; $D$ assisting him to pay and take up a large portion of them. $C$ then brought suits against $A$ and $B$, and other parites claiming an interest in the mortgaged premises, to foreclose them. $E$ and other creditors of $A$ and $B$, appeared in court; and, claiming to be the holders of certain of the notes and drafts of $A$ and $B$, indorsed or signed by $C$, as stated in the conditions of the deeds, prayed that the mortgaged premises should be vested in them, in proportion to their respective claims, on failure to pay the same. It was held, 1. that $C$, by force of the mortgages, became a trustee of the mortgaged property, for the benefit of all the holders of the paper of $A$ and $B$, indorsed or signed by $C$, as referred to in the deeds; 2. that the agreement of $C$ with $D$ was void, as against the other creditors, $C$ having become insolvent; but that $D$ was entitled to share in the property, in proportion to the amount paid by his assistance; 3. that all the holders of such paper of $A$ and $B$, were entitled to share in the mortgaged premises, in proportion to their respective claims; 4. that the fact that $C$ had paid a larger amount, than the whole value of the mortgaged premises, made no difference in this case, as the property remained, and $C$ had become insolvent; 5. that $C$ was entitled to a foreclosure, not merely for his own benefit, but for the benefit of $D$, $E$, and the other creditors; and that, as between these parties, no costs should be taxed against either, but as the suits were necessary to render the property available, the costs should be paid out of the proceeds of the property; 6. that the other defendants, who claimed merely an interest in the equity of redemption, were not chargeable with costs, unless they should elect to redeem, in which case, they should pay both debt and costs.

$C$ having paid and taken up a large amount of the claims against $A$ and $B$, and $E$ being the holder of certain notes &c. of $A$ and $B$, which were indorsed by $C$, after they were due and unpaid, $E$ brought a suit upon them against $C$, leaving copies with $A$ and $B$ as the debtors of $C$; and thereby claimed an interest in the property mortgaged by $A$ and $B$ to $C$. Held, that $E$, by this process, took no interest in the mortgaged premises, as against the other creditors of $A$ and $B$, holding claims of the same nature.

After the mortgages were given to $C$, the property went into the possession of $F$, under the authority of $C$; and $F$ took the rents and profits thereof. Notice in writing was thereupon given to $F$, by certain of the creditors of the mortgagors, claiming a share in the mortgaged premises, and that $F$ should ac-

count for such rents &c., as had or might come into his hands. At the same time, *F* had a claim against *C*, of greater amount than the whole value of the rents and profits; and claimed a right to set off one demand against the other. Held, that *F* had no right to apply the rents and profits in that manner, after notice; but was holden to account with such creditors as had given notice for their proportion of the rents, &c., thereafter accruing.

A mortgage of certain property was given jointly to *W* and *G*, partners, to secure a claim " on book, for goods sold and delivered, in about the sum of 5,000 dollars," as specified in the deed; and to *C*, to secure him as indorser &c. to the amount of 50,000 dollars. The actual claim of *W* and *G*, was 2,505 dollars, 85 cents; and the whole amount of *C's* indorsements exceeded 50,000 dollars. *C* received other securities, at the same time, but not enough in the whole to equal the amount of his endorsements. Held, 1. that *W* and *G* took *pro rata* in the premises jointly mortgaged, and only in the proportion of their actual book debt to 50,000 dollars; 2. that the description of *W* and *G's* claim was sufficiently certain, and the mortgage valid against subsequent incumbrancers.

*New-Haven,*
1849—1850.

Lewis
*v.*
De Forest.

THESE were suits in chancery, brought to the superior court, *October* term, 1847. The first two were brought to foreclose the defendants of their equity in certain mortgaged premises; the other, by the *Phoenix Bank* against *Lewis* and others, claiming that the bank had an interest in the same mortgaged premises, and praying the aid of a court of equity to protect that interest. The bills, answers, cross-bills and supplemental bills, were referred to a committee, who made a report, embracing, among other matters, the following facts.

On the 9th day of *April*, 1846, *William De Forest* and *Henry Hine*, manufacturers in company, under the name of *Wm. De Forest & Co.*, having become largely indebted and greatly insolvent, executed and delivered to *Milo Lewis* a mortgage deed of certain real estate, called the " *Naugatuck* property," to which was annexed the following condition: " The condition of this deed is this, that the said *Milo Lewis* is accommodation indorser and signer for us, on sundry notes, drafts, and bills of exchange of ours, or in our favour to sundry persons, banks, &c., to the amount of 50,000 dollars, which notes, &c., are now maturing, a particular description of which notes, drafts, and bills of exchange, we are not able to give, but which belong to us to pay and meet. Now, therefore, if we well and truly pay said notes, drafts and bills of exchange, and save him harmless from all liability as indorser and signer thereon, to the amount of said 50,000 dollars, then this deed is to be null and void, otherwise good and valid."

They also, at the same time, executed and delivered, to *Milo Lewis,* and to *William B. Lewis* and *George Lewis,* sons of *Milo Lewis,* and partners in company under the name of *Wm. B. & G. Lewis,* another mortgage deed of certain other real estate, called the "*Bethany* property", to which was annexed the following condition: "The condition of this deed is this, that we are indebted to the said *Wm. B. & G. Lewis* on book, for goods sold and delivered, in about the sum of 5,000 dollars; and whereas *Milo Lewis* is accommodation indorser and signer for us, on sundry notes, drafts, and bills of exchange, now maturing in sundry banks, and in the hands of sundry individuals, to the amount of 50,000 dollars, a particular description of which notes, drafts, &c., we are not able to give, or in whose hands they are: now therefore, if we well and truly pay said *Wm. B. & G. Lewis* their said debt, and save the said *Milo Lewis* harmless from all liability, as indorser and signer of said notes, &c., then this deed is to be void, otherwise valid."

They also gave to *Milo Lewis* two mortgage bills of sale of personal property, to secure him against the same liabilities mentioned in the other deeds.

At the same time, *William H. Elliott* was an accommodation indorser, subsequent to *Lewis,* on a large portion of the notes, drafts, and bills of exchange, intended to be secured by the mortgages; and thereupon *Lewis,* on the 11th day of *April,* 1846, executed and delivered to *Elliott* an instrument in writing, which, after reciting the mortgages of the personal property, and of the "*Naugatuck* property," proceeded as follows, to wit: "And whereas *William H. Elliott* is a subsequent indorser of certain notes and drafts, referred to in said mortgages, which I cannot now particularly describe; I hereby agree, that said property mortgaged to me, and the proceeds thereof, so far forth as I have power to apply the same, shall be well and truly applied to the payment of the said notes and drafts, of which the said *Elliott* is indorser as aforesaid; and I hereby declare and agree, that I hold the same in trust for that purpose alone, until said notes and drafts so by him indorsed, are fully paid and satisfied.

In witness whereof, I have hereunto set my hand and seal, this 11th day of *April,* 1846.        *Milo Lewis.*"    [Seal.]

When the notes, drafts, and bills of exchange, upon which *New-Haven,* 1849—1850.

*Lewis* was liable as indorser, became due ; in consequence of the failure and insolvency of *De Forest & Co.*, he was compelled to assume and take up a large portion of the same, amounting, on the 1st day of *February*, 1849, with damages included, to the sum of 40,937 dollars, 81 cents.

Lewis *v.* De Forest.

Of that amount *Elliott*, being also accommodation indorser subsequent to *Lewis*, assisted him to pay and take up 18,895 dollars, 74 cents, by substituting *Lewis's* notes indorsed by *Elliott ;* which notes of *Lewis* were, from time to time, renewed, as they became due ; and some payments were made upon the renewals, partly by *Lewis*, and partly by *Elliott*.

On the 14th of *April*, 1846, *De Forest & Co.* mortgaged to the *New-Haven Bank* the " *Naugatuck* property," and the personal property mortgaged to *Lewis*, to secure the payment of certain notes and drafts of *De Forest & Co.*, endorsed by *Lewis* and *Elliott ;* and in the deed there was a provision, that if said indorsers, or either of them, should be compelled to pay said notes and drafts, the mortgage should enure to his or their benefit. These notes and drafts were subsequently paid and taken up, by substituting *Lewis's* notes indorsed by *Elliott*, as mentioned above.

The committee found, that the book debt due to *Wm. B. & G. Lewis*, at the time of the mortgage to them, was 2,505 dollars, 85 cents ; that the value of the "*Naugatuck* property" was 13,010 dollars ; that of the " *Bethany* property" 2,500 dollars ; and that the personal property mortgaged to *Lewis*, was sold for 5,161 dollars, 59 cents ; and the avails applied by him towards the redemption and payment of the notes, drafts, and bills taken up by him.

On the 10th day of *April*, 1846, *Johnson, Bushnell & Rand*, and divers other creditors of *De Forest & Co.*, caused the real estate, mortgaged as aforesaid, to be attached as the property of *De Forest & Co. ;* and the former, being the first attaching creditors, having recovered judgments in their suits, caused the whole of said real estate to be set off to them on executions, in part satisfaction of their judgments.

On the 5th day of *November*, 1847, the *Phoenix Bank*, being holders of notes and drafts of *De Forest & Co.*, endorsed by *Lewis*, to a large amount, after they became due, and after the failure of the parties liable thereon, caused a

suit to be commenced thereon, against *Lewis*, by process of foreign attachment, and copies to be left with *De Forest & Co.*, as the attorneys, agents, factors, trustees, and debtors of *Lewis*.

Soon after the execution of the mortgages, *Milo Lewis* became and still is utterly insolvent. *Thomas Lewis* took possession of the real estate mortgaged under and by permission of *Milo Lewis*, and has ever since occupied the same ; and the value of the rents and profits, on the 1st day of *February*, 1849, amounted to the sum of 1,871 dollars, for which he remains accountable. *Milo Lewis* is, however, indebted to him, on general account, in more than 2,000 dollars. On the 13th day of *August*, 1846, the *Phoenix Bank* gave *Thomas Lewis* notice of the amount of their claims against *Milo Lewis*, and informed him, that they claimed a share of the security given to *Milo Lewis*, in proportion to their debts ; and so far as property or rents had or might come into his hands, the *Bank* would look to him for that share, and would expect him to account for the same to them.

At the time of the hearing before the committee, the debts of *De Forest & Co.*, then outstanding, for which *Milo Lewis* was liable, were the following, *viz :*

To the *Phoenix Bank*, 14,691 dollars, 27 cents ;

*New Haven County Bank*, 2,999 dollars, 20 cents ;

*Meriden Bank*, 669 dollars, 17 cents.

The object of the bill of *Milo Lewis* was, to obtain a foreclosure of all right to redeem the " *Naugatuck* property ;" and that of the bill of *Milo Lewis* and *Wm. B. & G. Lewis* was, to obtain a like decree respecting the " *Bethany* property." *De Forest & Co.*, the *Phoenix Bank*, the *New-Haven Bank*, the *New-Haven County Bank*, the *Meriden Bank*, *Elliott, Johnson, Bushnell & Rand*, and other attaching creditors, were made defendants in one or more of the three suits.

*Johnson, Bushnell & Rand*, in their cross-bills, set up their lien acquired originally by their attachments.

The *Phoenix Bank*, in their several answers, their bill, and cross and supplemental bills, set forth their proceedings under their writ of foreign attachment, by which, they averred, that they had acquired an equitable interest in the debt due from *De Forest & Co.* to *Milo Lewis*, and in the property mortgaged for the security thereof, and prayed that the

same might be protected for their benefit.   They also further
claimed, that they, and the other holders of  obligations
against *De Forest & Co.* endorsed by  *Lewis,* were entitled
to have their respective debts paid out of the property  mort-
gaged to *Lewis ;* and prayed, that unless the other  claimants
of the property paid such debts, the  court  would  decree  a
conveyance to them.

The *New-Haven County  Bank,* and the *Meriden Bank,*
respectively filed their answers, claiming each a share of the
property mortgaged to *Lewis.*

A particular description of all the notes &c., that had been
taken up by *Lewis,* was set forth in his bills.   It was  also
averred, and found by the committee, that, at the time of the
execution of the  mortgages, none of the said notes, &c., were
in the possession of  the parties to the  mortgage ; that *De
Forest & Co.,* then being in failing circumstances, it was  ab-
solutely necessary for the security of *Lewis,* that the mort-
gages should be executed before a more perfect or accurate
description of the  notes &c., could  be  made ; and that  the
best description of them  was given, that it was in the power
of the parties then to give.

The questions arising upon the  respective claims  of the
parties, and the  facts found  by the committee, were re-
served for the consideration and advice of this court.

The case  was  argued at *New-Haven,* at the *July* term
1849.   At the session of this court in *Fairfield* 1850, the case
being still under  advisement, and  questions having  arisen
concerning the allowance of costs, and the rule of division in
the premises jointly mortgaged to *Milo Lewis,* and *Wm. B.
& G. Lewis ;* the parties were cited in for the  further argu-
ment of these questions.  (*a*)

On the principal argument, *Baldwin* and *Ingersoll,* (with
whom was *Buel,*) for *Lewis* and *Elliott,* and *Bissell* for *Elliott*
alone, contended, 1. That the mortgages  are not invalid, as
against *Johnson, Bushnell & Rand,* the attaching  creditors,
for want of more particularity.   Both the nature and extent
of the incumbrance are sufficiently described.   *Booth* v. *Bar-
num,* 9  *Conn. R.* 286.   *Merrills* v. *Swift,* 18 *Conn. R.* 257.
*Bacon* v. *Brown,* 19  *Conn. R.* 29. and the cases there cited.

(*a*) No  briefs of the counsel, on those questions, have come into the hands of
the reporter.

*New-Haven,
1849—1850.*

*Lewis
v.
De Forest.*

2. That they were given by *De Forest* and *Hine* to *Milo Lewis*, their accommodation indorser, "to secure him as such indorser," to the amount specified in the conditions; the whole amount of his indorsements exceeding that sum, at the time. If the *Phoenix Bank*, or any other holder of the indorsed paper, has acquired any interest in the property, by reason of these mortgages, it must have been acquired, either by force of the contract itself, or of some collateral equity, growing out of the relations existing between the parties to the mortgages, and the holders of the indorsed paper.

But the contract was with *Lewis* alone, for his protection and indemnity, to a limited amount, and did not purport to convey any interest to any other person. The holders of the paper were unknown, and not in contemplation of the parties. 2 *Sto. Eq.* 602. § 1195. *Homer* v. *Savings Bank of New-Haven,* 7 *Conn. R.* 478. *Thrall* v. *Spencer,* 16 *Conn. R.* 139. *Philips* v. *Thompson,* 2 *Johns. Ch. R.* 422.

Again, as to any collateral equity. If *Lewis* has been damnified to the amount of the property, by reason of payments he has been obliged to make as indorser, so that it is *all* required for his own indemnity, there can be no *collateral equity* in favour of any other holders of the paper, to have any portion of it applied to their benefit. *De Forest & Co.* had a right to prefer them, if they chose. Not having done so, a mortgage by them to their *indorser,* for his indemnity, equitably imposes upon him no other duty, than that of applying his security to the payment of any liabilities he may be subjected to, as indorser, for his principals. So long as his liability remains contingent, or so long as (it being fixed) he continues to pay, equity creates no rights in favour of any creditor to the property. Having the legal title for his own protection, he has a right so to use it, as will render it most effectual for that purpose. If prior parties are liable on a portion of the paper he has indorsed, he has a perfect right to apply the property mortgaged, to debts for which he is primarily liable. If the law were otherwise, no indorser would ever be safe. All that equity requires, is, that, having the means of indemnifying himself, wholly or partially, he shall give to creditors, to whom he may become liable as indorser, the benefit of the security, till it is exhausted. An indemnity to the indorser, does not necessarily create a trust for the holders of the

*New-Haven,*
1849—1850.

Lewis
*v.*
De Forest.

paper. Their equitable lien is secondary to that of the indorser. The lien here claimed is a secret, insidious, and invisible lien—not appearing in the contract—and at war with our recording system. *Belcher* v. *Hartford Bank*, 15 *Conn. R.* 383. *Orvis* v. *Newell*, 17 *Conn. R.* 101. 2 *Poth. Obligat.* 35. § 520. (*Newbern ed.* 1802.) *Moses* v. *Murgatroyd*, 1 *Johns. Ch. R.* 129.

Having the legal title, and being no otherwise limited by the mortgagors, if he fairly applies the security, to its extent, to the payment of debts, which, as indorser, he is legally holden to pay,—no creditor, who has not a specific lien by contract, has a right to complain. On the other hand, if the indorser, being insolvent, refuses to apply his security, or to make payments to the amount of it, an equity then arises in favour of those having claims against him as indorser, to which it might be applied, to compel such application. This equity is *collateral* to the mortgage. It grows out of the conduct of the party secured, in refusing, when insolvent, to make any application of the fund, to the debts for which he is liable as indorser. It rests on the basis of benevolence and general equity merely. *Orvis* v. *Newell*, 17 *Conn. R.* 101. 2 *Poth.* 33. 35. *New-London Bank* & al. v. *Lee*, 11 *Conn. R.* 118.

A fund so remaining unapplied, would be justly regarded as in the nature of equitable assets, and distributed *pro rata*. It is on this principle that the case of *Maure* v. *Harrison*, 1 *Eq. Ca. Abr.* 93. and the cases that have followed it, have been decided. It is the principle on which rests the doctrine of *subrogation* or substitution, derived from the civil law. Hence it is, that if an indorser or surety on a specified note, has a counter security, and refuses to apply it, equity will give to the creditor the benefit. If an indorser of many notes has an indemnity to the full amount, which he, being insolvent, refuses to apply, equity will enforce the application. But where the indemnity is but *partial*, and is applied *bona fide* to debts within the scope of it,—there being no fund remaining unapplied in the hands of the surety, and no contract with any other creditors creating a lien on the fund,—they must rely solely on their *legal remedies* against the maker and indorser. No facts exist, out of which a collateral equity can be raised in their favour. *Maure* v. *Harrison*, 1 *Eq. Ca. Abr.* 93. *Moses* v. *Murgatroyd*, 1 *Johns. Ch. R.*

New-Haven,
1849—1850.

Lewis
v.
De Forest.

119.   *Homer* v. *Savings Bank*, 7 *Conn. R.* 478.   *New-London Bank* & al. v. *Lee*, 11 *Conn. R.* 112.   *Wiggin* v. *Dorr*, 3 *Sumner*, 420.   *Belcher* v. *Hartford Bank*, 15 *Conn. R.* 383.   *Stamford Bank* v. *Benedict, Id.* 445, 6.   *Thrall* v. *Spencer*, 16 *Conn. R.* 139.   *Wade* v. *Coope*, 2 *Simons*, 155.

In this case, *Lewis*, when the mortgage was given, was solvent.  His liabilities were all contingent.  On the paper held by the *Phoenix Bank*, there were other parties besides *De Forest & Co.*, primarily liable.  He continued to pay, where he was primarily liable, from his own resources, and as he realized from the mortgage, to an amount greatly exceeding the value of all the security he held.  To enable him to effect this, he had made, in good faith, his arrangement with *Elliott*.  Under that arrangement, *Elliott* has assisted him in payments to the amount of about 19,000 dollars, for which he has no other security, as *Lewis* is now insolvent.  He is therefore entitled to a decree, to vest in him the title to the property, on failure to pay the sum so paid by him, with interest from *February*, 1849.  And as against subsequent incumbrancers, *Lewis* is entitled to a decree on non-payment of the balance of the sums paid by him, with interest.

3. That in regard to the foreign attachment, in which *De Forest & Co.* are proceeded against as the debtors of *Lewis;* if any interest in *Lewis's* securities could be so acquired, *Elliott* had long before that process, acquired a superior right.  But no such interest can be acquired, by foreign attachment, under any circumstances.   *Judah* v. *Judd*, 1 *Conn. R.* 309.

*Bristol*, for the *New-Haven County* and *Meriden Banks*, contended, 1. That the mortgage deeds are valid.  Their conditions give reasonable notice of the claims intended to be secured.   *Pettibone* v. *Griswold*, 4 *Conn. R.* 158. 162.  *Stoughton* v. *Pasco*, 5 *Conn. R.* 442.   *Crane* v. *Deming*, 7 *Conn. R.* 388. 395.   *Booth* v. *Barnum*, 9 *Conn. R.* 286. 290.  *Hart* v. *Chalker*, 14 *Conn. R.* 80.   *Merrills* v. *Swift*, 18 *Conn. R.* 257.

2. That the property in question, having been mortgaged to *Lewis*, to secure the claims held by the banks, &c. they are entitled to the securities in his hands, for the payment of the claims for which they are pledged.   *Homer* v. *Savings Bank of New-Haven*, 7 *Conn. R.* 478. 484.   *New-London*

*Bank* & al. v. *Lee,* 11 *Conn. R.* 120.	*Orvis* v. *Newell,* 17 *Conn. R.* 101.	*Moses* v. *Murgatroyd,* 1 *Johns. Ch. R.* 119. *Union Bank* v. *Edwards,* 1 *Gill & Johns.* 346.	2 *Sto. Eq.* § 1047, 58, 65.	1217.	*Leeds* v. *The Marine Insurance Company,* 6 *Wheat.* 565.	It is the *debt,* which is to be protected by the fund; and it makes no difference into whose hands the fund may come, or how it is modified.	Until the debt is paid, the pledge accompanies it, and remains for its redemption.	*Belcher* v. *Hartford Bank,* 15 *Conn. R.* 383. *Hodgson* v. *Shaw,* 3 *Mylne & K.* 190.	1 *Sto. Eq.* 592. & seq.

3. That the doctrine, that the surety has a right to appropriate the property pledged for his indorsements to the payment of such claims, as the surety, at his own option, may prefer, is unconscientious, and inconsistent with the doctrine of subrogation.	It substitutes the will of the surety for the established rules of equity.	*Eastman* v. *Foster,* 8 *Metc.* 19. Where a principal applies a payment, equity will not permit a surety to interfere, although if he had applied it differently, the surety might have been relieved.	The same rule holds, where the security is given to the surety.	*Stamford Bank* v. *Benedict,* 15 *Conn. R.* 437. 444.	*Union Bank* v. *Edwards,* 1 *Gill & Johns.* 346.	*Thrall* v. *Spencer,* 16 *Conn. R.* 139. *Hartford Bank* v. *Belcher,* 15 *Conn. R.* 381.

4. That all the holders of the paper, referred to in the conditions of the deeds, by virtue of the mortgages, obtained an equitable lien upon the mortgaged property; and *Lewis* thereby became a trustee for those creditors, to pay them *in full,* if the property is sufficient, and, if not, *pro rata.*	*Homer* v. *Savings Bank,* 7 *Conn. R.* 478. 484.	*New-London Bank* & al. v. *Lee,* 11 *Conn. R.* 120.	*Moses* v. *Murgatroyd,* 1 *Johns. Ch. R.* 119.	*Eastman* v. *Foster,* 8 *Metc.* 19.	1 *Sto. Eq.* 79. § 64. *f.*	A court of equity will not assist a trustee to exercise his mere whim or caprice, in regard to the trust estate, to the disadvantage of the *cestui que trusts.*	The counsel also cited 2 *Sto. Eq.* § 1197. 1205. 1206.	1 *Sto. Eq.* 76. § 64. *e.*

*Kimberly* and *C. A. Ingersoll,* for *Johnson, Bushnell & Rand,* contended, That the mortgages generally were invalid, as against the attaching creditors.	They were not

given to secure a debt due to *Milo Lewis.* At the time they were given, it was not certain that there would ever be a debt due him from *De Forest & Co.* They purport to be given to secure *Lewis* against a *contingent liability.* It has never as yet been decided, in this state, that such a mortgage need not particularly specify or describe the liability to be secured. Where it has not been done, the mortgage has not been considered good, as against subsequent incumbrancers. *Pettibone* v. *Griswold,* 4 *Conn. R.* 158. *Shepard* v. *Shepard,* 6 *Conn. R.* 37. *Hubbard* v. *Savage,* 8 *Conn. R.* 215. *Sanford* v. *Wheeler,* 13 *Conn. R.* 165. *North* v. *Belden, Id.* 376. No new principle was established by this court, in the case of *Merrills* v. *Swift,* which has been cited. See the opinion of *Storrs,* J. *p.* 264. We must therefore look to former decisions, to see what the correct principles are.

By the decisions which have been made by this court, upon the validity of mortgages of real estate, the following principles have been established.

First, the particular debt or liability to be secured, must be described particularly in the mortgage ; so that it shall appear upon the record, with reasonable certainty, what the real nature of the transaction is, and what particular debt or liability is intended to be secured. *Pettibone* v. *Griswold,* 4 *Conn. R.* 158. *Stoughton* v. *Pasco,* 5 *Conn. R.* 442. *Shepard* v. *Shepard,* 6 *Conn. R.* 37. *Crane* v. *Deming,* 7 *Conn. R.* 388. *Hubbard* v. *Savage,* 8 *Conn. R.* 215. *Booth* v. *Barnum,* 9 *Conn. R.* 286. *Sanford* v. *Wheeler,* 13 *Conn. R.* 165. *North* v. *Belden, Id.* 376. *Hart* v. *Chalker,* 14 *Conn. R.* 77. *Frink* v. *Branch,* 16 *Conn. R.* 260. *Merrills* v. *Swift,* 18 *Conn. R.* 257.

Secondly, if there is ever any relaxation of the rule, it is in those cases only, where such *data* are given as will put any one interested in the inquiry, upon a track leading to the discovery of what the particular debt or liability is, which is intended to be secured by the mortgage ; and where the nature of the debt or liability is such, that it could not be reasonably expected that the mortgagor could give a more particular description. See the cases above cited. In the mortgages now in question, the particular liabilities intended to be secured are not specified ; and no track is pointed out, which would lead any one interested in the inquiry, to the discovery

*New-Haven,*
1849—1850.

Lewis
*v.*
De Forest.

of the particular liabilities intended to be secured. The mortgagors pretend not to know, what the particular liabilities are, or where they are. The mortgagee pretends not to know. They do not tell who does know. It is all uncertainty.

Thirdly, the condition of the mortgage must also be such, and the incumbrance on the property must be so described and defined, as to prevent the substitution of anything, which a fraudulent grantor may devise, to shield himself from the demands of his creditors. *Pettibone* v. *Griswold,* 4 *Conn. R.* 162. *Hart* v. *Chalker,* 14 *Conn. R.* 77. and the other cases before cited.

There is great danger of fraud in a mortgage of this kind, by the substitution of other notes and drafts. If, in this case, they do not amount to 50,000 dollars, *De Forest & Co.* have only to make new drafts, and have *Lewis* indorse them, and the mortgage is made good. It is a *gum-elastic* mortgage— it may cover anything.

Again, there is no sufficient reason given in the report of the committee, why the incumbrance was not particularly described. It is fair to infer, that *De Forest & Co.* conducted their business in the usual manner. Their bill-book would show the amount and date of each note and draft, the time when payable, and by whom endorsed. But the creditors are about to attach. *Lewis,* knowing this, procures the mortgage to be executed. The substance of the finding is, that if time had been taken for a particular description of the notes and drafts, intended to be secured, the attachments would have been served before the mortgage was executed.

2. That the mortgage to *Wm. B. & G. Lewis,* especially, is not good, as against the attaching creditors. It was given to secure a debt of 5000 dollars. But the debt then due them was only 2505 dollars, 85 cents. No good reason is given why their debt was not more particularly described. Same cases as before cited.

*O. S. Seymour,* for the *Phoenix Bank,* insisted, 1. That the mortgages were valid, the description of the notes and drafts being as certain, as could be made at the time. *Merrills* v. *Swift,* 18 *Conn. R.* 257.

2. That it is true, as a general proposition, that a mortgage

made by the debtor to his indorser or surety, enures to the benefit of the creditor ; and vests in the creditor certain valuable rights, which are now universally recognized and protected by courts of equity, and which are also, in some instances, recognized and protected at law.  *Belcher* v. *Hartford Bank*, 15 *Conn. R.* 381.  *New-London Bank* & al. v. *Lee*, 11 *Conn. R.* 112.  *Homer* v. *Savings Bank of New-Haven*, 7 *Conn. R.* 478.  *Philips* v. *Thompson*, 2 *Johns. Ch. R.* 418. 422.  *Moses* v. *Murgatroyd*, 1 *Johns. Ch. R.* 119. 129.  *Kip* v. *The Bank of New-York*, 10 *Johns. R.* 63. 65. *Heath* v. *Hand*, 1 *Paige*, 329.  *Bank of Auburn* v. *Throop*, 18 *Johns. R.* 505.  *Keyes* v. *Brush*, 2 *Paige*, 311.  *Russell* v. *Clark's* exrs. 7 *Cranch*, 69.  *Eastman* v. *Foster*, 8 *Metc.* 20. 28.  *Wright* v. *Morley*, 11 *Ves.* 22.

3. That there is nothing in these mortgages, to prevent the application to them of the general rule.  The language of their conditions is the same, as is usual in those that have been held to enure to the benefit of the creditor.  *Homer* v. *Savings Bank*, 7 *Conn. R.* 478.  The fact, that the property is not sufficient to pay all the debts, can not subject the interests of the *cestui que trust* to the caprice of the trustee, nor allow him to pay one creditor in full, and leave another wholly unpaid.  Immediately on the execution of the mortgages, all these creditors took an equal and vested interest in the mortgaged premises ; and no subsequent act of *Lewis* has disturbed, or can disturb, their rights.  *Lewis* is also the debtor of all these creditors, on these *very claims*, to secure which the property was mortgaged.  He has consented, by receiving the mortgages, to the sequestration of this property for these debts.  If the foregoing propositions are true, it will necessarily follow, that his *declaration of trust* in favour of *Elliott*, is a mere nullity.

4. That the creditors of *De Forest & Co.* have a claim on *Thomas Lewis*, for the proceeds of the personal property, and the rents of the real estate now in his hands.  He purchased of a mere trustee, with notice of the trust ; and *Milo Lewis*, the vendor, being insolvent, the vendee is bound to see to the application of the purchase money.

5. That, if the foregoing propositions are wrong, then the payments made by *Milo Lewis* create a debt in his favour against *De Forest & Co.*, which is secured by the mortgage.

The *Phoenix Bank* has acquired a right to this debt, and to the security incident to it, by their foreign attachment process. The writing executed to *Elliott*, is not in the way of this process; for that writing merely purports to be an agreement, to hold the property in trust, for *one* only of the *cestui que trusts*. It is an attempt to change the legal effect of the mortgages, and is utterly void; as it is in fraud of the equal rights of all those for whom *Lewis* was bound to act as trustee. It does not purport to assign to *Elliott* any debt, which *Lewis* might thereafter have against *De Forest & Co.*, by reason of payments thereafter to be made by *Lewis* from his own fund. Nor was it the intention to convey any such debt. Nor was notice ever given to any one, of this instrument, as an assignment. *Woodbridge* v. *Perkins*, 3 *Day*, 364. *Green* & al. v. *Gillet*, 5 *Day*, 485. *Judah* v. *Judd*, *Id.* 534. And if it were an assignment, it is only of a portion of the mortgaged premises. At the date of it, *Lewis* was a mere trustee; and the writing is conversant only with his conduct as such trustee. If, by subsequent payments, he has acquired rights, they are new rights against *De Forest & Co.*, and new rights against the mortgaged property—rights which he had not as trustee.

The aid of a court of chancery is therefore needed, to connect the mortgaged premises with the debt, which we have attached. If *Lewis* is entitled to a foreclosure, the decree ought to be qualified by an injunction against a sale by him, while the foreign attachment process is pending; and with an order, that when we have consummated our right to the debt by judgment and demand, then *Lewis's* interest in the mortgaged premises shall be transferred from him, and vested in the *Phoenix Bank*.

WAITE, J. The first question is, whether the mortgages of the real estate are valid as against the subsequent attaching creditors. Immediately after the execution of these mortgages, the property was attached and subsequently set off, upon executions, as the property of *De Forest* and *Hine*, to *Johnson, Bushnell & Rand*. Unless the property can be holden, by virtue of the mortgages, the title has become vested in the levying creditors.

The object, it is said, was, not to secure the payment of

*New-Haven,*
*1849— 1850.*

Lewis
*v.*
De Forest.

any existing debt, but to indemnify the mortgagee against a *contingent liability.* But that liability had been previously assumed ; and *Lewis* had as strong claims for indemnity, as any creditor had, for the payment of his debt.

The principal objection, however, relates to the vagueness of the condition. It does not, it is said, specify the liabilities, in such manner, that the creditors can learn from the record, either the precise extent of the incumbrance, or the means, by which, upon inquiry, that extent can be ascertained. It could be of no use to inquire of the parties ; because the deeds state, that they were unable to give the requisite information.

The case, however, seems to fall directly within the principle recognized by the case of *Merrills* v. *Swift*, 18 *Conn. R.* 257. There, the mortgage was to secure the payment of 1,500 dollars, which the mortgagor owed on book, and by several notes, without specifying the amount or date of any particular note. Yet as the amount of the indebtedness was given, the mortgage was holden valid.

Here, the extent of the mortgagee's liability is given ; and the committee has found, that a liability to that extent existed, at the time of the execution of the mortgages. The omission to describe the particular notes in the former case, was holden not to be fatal to the deed ; a like omission in the present deeds, can not have any greater effect. And although that case went to the very verge of the law upon this subject, yet we can not discover sufficient ground for distinguishing the present case from the former.

The only material difference is, that one was given to secure a debt of a specified amount, the others to secure the mortgagee against liabilities to a specified extent. The claim for indemnity, in the latter case, as we have already said, is as strong as in the former.

Again, it is said, the mortgage to *Wm. B. & G. Lewis* is not good, as against the attaching creditors ; because their debt is described in the deed as being 5,000 dollars, when in truth it was but 2,505 dollars, 85 cents. But the deed does not profess to give the precise amount of the debt. It is described, as being *about* the sum of 5,000 dollars. Debts of that character are often unliquidated, and consequently, the precise balance can not always be given. Besides, there is

no pretence of any fraudulent misrepresentation of the amount of the debt. The case, in this particular, is no stronger in favour of the attaching creditor, than the one cited, where the amount of the book debt, aside from the notes, was not given.

2. The next inquiry is, who is entitled to the property in question ? *Lewis,* or these creditors, for whose debts he is still liable, by reason of his endorsements ? As against *De Forest* and *Hine,* he undoubtedly would be entitled to a decree of foreclosure. He has already paid more than 40,000 dollars of their debts ; and he has a right to call upon them to reïmburse him, or be foreclosed of their right to redeem the property mortgaged for his security.

But the controversy is not with them. The claim upon the property is made, by those creditors, whose debts still remain unpaid, and for the payment of which *Lewis* continues liable. It is as much his duty to pay them, as it was to pay the other creditors. And it is no answer to their claim, that he has already paid more on account of the property, than the whole is worth.

The mortgages were given for his protection, and created a trust for the benefit of these creditors, to whom he was liable. His duty was, to appropriate the property in discharge of his liabilities. So long as he remained solvent, and his creditors did not interfere with his management of the funds, he might apply them as he pleased in discharge of his liabilities. Such disposition he has already made of the personal property mortgaged to him. He has sold it, and paid over the proceeds to such creditors as he preferred ; and although they may have received more than their proportional shares of the property mortgaged by *De Forest* and *Hine,* it is now too late to disturb that disposition.

But the property in question remains, as it was, when mortgaged to *Lewis.* He calls upon the court to give him a perfect title. But his creditors come in, and shewing his insolvency and consequent inability to pay, otherwise than by means of the property in question, ask that it may be applied in fulfillment of the trust created by the mortgages.

The case, under these circumstances, comes directly within the principles recognized in the case of the *New-London Banks* v. *Lee* & al. 11 *Conn. R.* 112. There, it was holden,

that the creditors of an indorser, who had become insolvent, and had refused to apply the funds mortgaged to him in payment of his liabilities, were entitled to the aid of a court of chancery, in enforcing the application of those funds.

So, in the present case, *Lewis*, having become insolvent, has no claim upon a court of chancery, for its aid in depriving his creditors of the funds conveyed to him for their benefit.

3. Another question arises respecting the extent of *Elliott's* interest in the property. He claims a preference, as against the other creditors, in consequence of *Lewis's* agreement to give him that preference. Had *Lewis*, before any claim was made upon the property by these creditors, applied it, in payment of those debts for which *Elliott* was liable, such disposition would not now be disturbed. But as yet he has made no such disposition of the property; nor has he conveyed it, either to *Elliott*, or any other person. It remains as it was, when first mortgaged. *Lewis* has simply entered into an agreement, that he will apply the funds in his hands, to the payment of those debts, for which *Elliott* is liable, and will hold them in trust for that purpose. Can this unexecuted agreement be enforced? As against *Lewis*, it might be. But, in consequence of his insolvency, his interest in the property is made to yield to the superior equity in favour of his creditors.

The question then is, whether *Elliott* presents a stronger claim to be enforced in equity, than those other creditors? And we are inclined to think, that he does not. He has not, in consequence of that agreement, assumed any new liability. He has simply assisted *Lewis* in paying debts, for which both were previously liable. But as these creditors, who have been thus paid, would have been entitled to come in, and share in the property in question, had it not been for such payments, we think *Elliott* is entitled to stand in their places, and be treated as a creditor of *De Forest* and *Hine*, to the extent of the debts paid and assumed by him.

It is claimed, that this decision conflicts with that in the case of *Thrall* v. *Spencer*, 16 *Conn. R.* 139. In that case, the indorser parted with his interest, without fraud, and before any claim was made by the creditor. The latter had lain by, for a long period of time, without making claim to any equitable lien upon the property. But in the present

case, and in that of the *New-London Banks* v. *Lee* & al. the lien is insisted upon, by the creditors, while the property remains in possession of the indorser.

4. The claim of the *Phoenix Bank,* under their foreign attachment suit, stands upon similar ground. Had they been able to go on, and enforce the payment of their debt in their action at law, a court of chancery might not interfere. But when they are obliged to resort to that court, and invoke its aid against the claims of the other creditors ; to obtain that aid, they must shew a superior equity in their favour. This, we think, they have failed to do.

5. What share do the sons of *Milo Lewis* take in the " *Bethany* property," mortgaged to them and their father jointly ? The mortgage was given to the latter, to secure him as an indorser to the amount of 50,000 dollars ; and to the former, the payment of their book debt, supposed, at the time, to amount to about 5,000 dollars. Upon examination, it is found, that the liabilities of the father amount to the sum specified in the deed ; but the book debt of the sons amounted only to the sum of 2,505 dollars, 85 cents.

As the object of the conveyance was merely to secure these two claims, the mortgagees take in proportion to their respective claims—that is, in the proportion of 50,000 dollars to 2,505 dollars, 85 cents.

The fact that *Milo Lewis* had other property mortgaged to him as security against his liabilities, under the circumstances of the present case, can not affect his interest in the " *Bethany* property." For, it appears, that all the property mortgaged will be insufficient to discharge his liabilities. Had the other property been sufficient for that purpose, his sons might insist upon his resorting to that, for the purpose of letting them in to a greater share in the " *Bethany* property." But such is not the present case.

6. It appears from the report of the committee, that *Thomas Lewis,* under authority from *Milo Lewis,* has received the rents and profits of the real estate, since the execution of the mortgages ; and is accountable for the same. But he has a debt against *Milo Lewis,* greater in amount than that for the rents and profits. The question is, how far he has a right to set off one demand against the other.

As *Milo Lewis* has paid a large amount of the debts of *De*

*Forest & Co.* from his own private funds, he has become a creditor of theirs, to the amount so paid by him. So far as they are concerned, he had a right to apply the rents and profits toward the payment of his debt to *Thomas Lewis;* and the latter might set off his debt against the demand for rents. And this, we think, continued, until the creditors gave notice, that they claimed to have the property, in the hands of *Milo Lewis*, treated as trust property, for their benefit. Such notice, it appears, was given to *Thomas Lewis*, by the *Phoenix Bank;* and from that time, he ceased to have a right to apply the whole rents subsequently received, in liquidation of his debt against *Milo Lewis.*

7. The remaining inquiry relates to the costs in the suits. The bills were brought to obtain a foreclosure of certain mortgaged premises. So far as the defendants claimed merely an interest in the equity of redemption, they are not chargeable with costs, unless they elect to redeem; and then they must pay both debts and costs. 2 *Sw. Dig.* 197.

*Johnson, Bushnell & Rand* attached and levied upon the property, as belonging entirely to *De Forest & Co. ;* and if they did not acquire a valid title as against the mortgagees, they at least acquired an interest in the equity of redemption ; and having such interest, they have a right to redeem the plaintiffs. Under the circumstances, we think they ought to stand upon the same ground as the other defendants, having merely an interest in the equity of redemption, and not be subjected to costs, unless they redeem the property mortgaged.

With respect to the suit of *Milo Lewis*, he is entitled to a decree of foreclosure, not merely for his own benefit, but for the benefit of his creditors; the *Phoenix Bank*, the *New-Haven County Bank*, the *Meriden Bank*, and *William H. Elliott.* As between these parties, no costs should be taxed against either. But as the suit was necessary for the purpose of making the property available to these parties, the costs of the suit ought to be paid out of the proceeds of the property, provided it is not redeemed.

A similar decree should be passed in the other suit, brought by *Milo Lewis* and his sons. No costs should be taxed, either against the plaintiffs, the three *Banks* or *Elliott;* but the

costs of the suit should be paid out of the proceeds of the property, when sold.

We therefore advise the superior court, to pass decrees of foreclosure against all the defendants, who have no interest in the property beyond the equity of redemption ; and in case of their failure to redeem within the time limited, that the property be sold, and the proceeds of the " *Naugatuck* property," after deducting therefrom the costs of the suit and the expenses attending the sale, be divided among the creditors of *Milo Lewis, viz.* the *Phoenix Bank,* the *New-Haven County Bank,* the *Meriden Bank,* and *William H. Elliott,* in proportion to their respective claims against him. That the proceeds of the " *Bethany* property," after deducting the costs and expenses of the suit, in that case, be divided among the aforesaid creditors, and *Wm. B. & G. Lewis,* in proportion to the interest conveyed to the latter and *Milo Lewis* respectively, by virtue of the mortgage deed to them ; and that the share of the said creditors be divided among them, in the same manner, as the proceeds of the " *Naugatuck* property."

In this opinion the other Judges concurred.

Special decree.